# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**VICTOR C. LUNSFORD**
        **Plaintiff,**

    **v.**                                      **Case No. 09-C-0464**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

This matter is before me on plaintiff Victor Lunsford's request for judicial review of the denial of his application for social security disability benefits. Plaintiff has thrice applied for benefits, without success.

His first application, filed in 2000, was denied by an Administrative Law Judge ("ALJ") after an August 2002 hearing. (Tr. at 747.) The second, filed in July 2003, was denied at the administrative level later that year, and plaintiff did not request a hearing or pursue the matter further. (Tr. at 789-800.) On July 24, 2006, plaintiff filed the instant application, alleging disability commencing February 10, 2000 due to a variety of physical and mental impairments, including diabetes, dermatitis, celiac disease, heart disease, depression, degenerative disc disease and carpal tunnel syndrome. (Tr. at 62; 73.) The Social Security Administration ("SSA") also denied this application at both the initial (Tr. at 45; 49) and reconsideration stages (Tr. at 46; 54). Plaintiff requested and obtained a hearing before an ALJ, and the matter was assigned to the same judge who denied his 2000 application. (Tr. at 768-71.)

At the hearing, plaintiff amended his alleged onset date to September 8, 2002, the date

of his fiftieth birthday. (Tr. at 771-72.) However, the ALJ concluded that the doctrine of res judicata precluded a finding of disability prior to December 30, 2003, the date of the last denial. (Tr. at 15; 797.) He further concluded that plaintiff remained insured for purposes of disability insurance benefits only through March 31, 2005, and that plaintiff therefore had to establish disability on or before that date. (Tr. at 16.) After reviewing the medical and testimonial evidence, the ALJ concluded that through the date last insured plaintiff retained the ability to perform light work with various additional limitations. (Tr. at 18.) Based on the testimony of a vocational expert ("VE"), who identified several jobs plaintiff could perform within these limitations, the ALJ concluded that plaintiff was not disabled at any time from September 8, 2002, the alleged onset date, through March 31, 2005, his date last insured. (Tr. at 22.)

Plaintiff asked the Appeals Council to review the ALJ's decision, but the Council declined (Tr. at 6), making the ALJ's decision "final" for purposes of judicial review under 42 U.S.C. § 405(g). See Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). Based on a combination of errors, I reverse and remand for further proceedings.

## I.  STANDARD OF REVIEW

Under § 405(g), I review the ALJ's decision to determine whether it is supported by "substantial evidence" and free of harmful legal error. Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009). Thus, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the ALJ's decision to deny the application must be upheld. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).

Although this standard of review is deferential, "it is not abject." Parker v. Astrue, No.

2

09-2270, 2010 WL 851412, at *1 (7th Cir. Mar. 12, 2010).  I may not uphold a decision, even if the record contains evidence supporting it, if the ALJ failed to mention highly pertinent evidence, or because of contradictions or missing premises failed to build a logical bridge between the facts of the case and the outcome.  Id.  Similarly, if the ALJ commits an error of law, reversal is "required without regard to the volume of evidence in support of the factual findings."  Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).  Because an administrative agency is bound by its own rules, an ALJ's violation of SSA regulations constitutes legal error.  See Terry, 580 F.3d at 476; see also Golembiewski v. Barnhart, 382 F.3d 721, 724 (7th Cir. 2004).

## II.  FACTS AND BACKGROUND

### A.     Medical Evidence

The administrative transcript in this case contains medical records dating back to 1999, when plaintiff received treatment for abdominal pain (Tr. at 178) and underwent a partial colectomy secondary to diverticulitis (Tr. at 193; 203; 207; 240; 581).  On February 5, 2000, plaintiff suffered a heart attack, after which doctors performed an angioplasty with placement of stents.  (Tr. at 161-71.)  He appeared to do well related to his cardiac condition through the balance of 2000.  (Tr. at 181-96; 208-09).  However, in November 2000, he complained of recurrent abdominal pain, and ER doctors assessed duodenitis,[1] which resolved with the administration of Mylanta and viscus lidocaine.  (Tr. at 202-03).  On re-check with his primary physician on December 14, plaintiff indicated that he did well for a couple weeks but his discomfort returned after he became upset with his young son.  He also indicated that for the

---

[1]Duodentis is inflammation of the first division of the small intestine.  Stedman's Medical Dictionary 547 (27th ed. 2000).

3

past four years he had been feeling sad, depressed and blue, and lacked motivation and energy. The doctor prescribed Paxil, an anti-depressant. (Tr. at 240.) On December 27, plaintiff reported that his depression improved, and that use of Prilosec caused some improvement but he still felt abdominal discomfort every now and then. (Tr. at 239.)

In February 2001, plaintiff reported improved mood, sleep and motivation (Tr. at 239), but complained of intermittent chest pain and shortness of breath with exertion (Tr. at 187; 200; 239). Subsequent cardiac testing revealed a "posterior defect with some marginal ischemia,"[2] but no significant change compared to a scan completed the previous fall. (Tr. at 189-90.) In June of 2001, a cardiologist noted that plaintiff had been reasonably stable since his last visit, with occasional episodes of chest pain with heavy housework, diminishing with rest. (Tr. at 191.)

In July of 2001, plaintiff began complaining of low back pain, as well as pain, numbness and tingling in his hands and feet. (Tr. at 238.) X-rays revealed mild spondylosis at C5-6, but a normal lumbar spine (Tr. at 199; 252), and lab work revealed a mild glucose intolerance (Tr. at 237). In August 2001, plaintiff saw a neurologist, Dr. Raval, related to his hand complaints, with the doctor finding evidence of polyneuropathy and carpal tunnel syndrome on both sides. Dr. Raval ordered an EMG nerve conduction study, as well as tests to rule out diabetic neuropathy (Tr. at 224; 229-30), but the tests were not completed at that time, as plaintiff moved from Iowa, where Dr. Raval practiced, to Wisconsin (Tr. at 236).

Following his move to Wisconsin in late 2001, defendant began receiving treatment from Dr. Chang. (Tr. at 296-97.) Notes from January 2002 reflect that plaintiff continued to

_____

[2]Ischemia refers to local anemia due to mechanical obstruction (mainly arterial narrowing or disruption) of the blood supply. Stedman's Medical Dictionary 924 (27th ed. 2000).

4

complain of numbness in his right hand and legs, as well as occasional chest pain with activity. Dr. Chang provided blood pressure medication and referred plaintiff for a consult with a cardiologist, Dr. Posner, and a neurologist, Dr. Joseph. (Tr. at 294.) Dr. Joseph diagnosed peripheral/polyneuropathy of unknown etiology and ordered an EMG nerve conduction study (Tr. at 346), which revealed evidence of severe carpal tunnel syndrome in both the right and left upper limbs (Tr. at 255-56). Dr. Chang recommended surgery, but plaintiff declined, hoping that his carpal tunnel symptoms would improve with rest. Dr. Posner provided a new blood pressure medication, resulting in improved readings, and plaintiff denied further chest pain when he returned to Dr. Chang in March 2002. (Tr. at 292-93.)

In July of 2002, plaintiff began complaining of dermatitis-type symptoms, with fungal involvement at the base of his fingertips, for which his new primary care physician, Dr. Sobolewski, provided Lamisil samples. (Tr. at 292.) Plaintiff returned to Dr. Sobolewski on September 9, 2002 for evaluation of his joint pain, but he experienced acute chest pain in the waiting room, resulting in his transportation to the hospital where a cardiac catheterization was performed. (Tr. at 291; 465-66; 478-81.) Subsequent testing revealed "pretty much obliteration of one of his coronary arteries." (Tr. at 289; see also Tr. at 378-81; 406-07; 467-68.)

Following his release from the hospital, plaintiff returned to Dr. Sobolewski regarding his neck, back and wrist complaints, and the doctor obtained lumbar scans, which revealed mild disc degeneration from L1-L2 through L4-L5, provided pain medication, and referred plaintiff for physical therapy. (Tr. at 288-89; 736-38.) On return visits to Dr. Sobolewski in late 2002 and early 2003, plaintiff reported some improvement in his back pain with physical therapy and chiropractic treatment. (Tr. at 280 281; 285; 286; 288; 532-80; 736.) However, he reported no improvement in his dermatitis and nail fungus, and by July 2003 the rash had spread to his

5

neck and face.  (Tr. at 276.)  Plaintiff began seeing Dr. Fechter in August 2003, and she prescribed a new medication and cream, which initially provided relief, but the rash flared up again, causing Dr. Fechter to refer plaintiff to Dr. Godar.  (Tr. at 271-75.)[3]  Dr. Godar obtained a biopsy and prescribed a medication called dapsone, which provided good relief.  (Tr. at 328-33; 377).

Plaintiff returned to Dr. Fechter on October 13, 2003, requesting that she find him disabled based on his back pain and heart condition, but Dr. Fechter noted that the MRI revealed only mild disc dessication and bulging, with no evidence of herniation or central stenosis, and that, according to the chart, plaintiff could return to work with no concerns with his heart aside from heavy lifting.  (Tr. at 267; 307; 308.)  She opined that there probably were jobs he could do within his heart restrictions and suggested other modalities to help with his back pain with the anticipation of continuing him in the workforce, but plaintiff requested disability, stating: "I just don't want to work anymore."  (Tr. at 267.)  During an office visit the following month, plaintiff provided Dr. Fechter with a letter attempting to explain what he meant by this statement, but the letter does not appear in the record.  Dr. Fechter provided plaintiff with a Hamilton Rating Scale for depression to further evaluate the etiology of his concerns.  (Tr. at 266.)

On November 21, 2003, plaintiff saw Dr. Khoury related to this abdominal complaints, and the doctor assessed possible celiac sprue[4] and ordered a various tests (Tr. at 319-20; 455-

---

[3]In September 2003, Dr. Fechter also ordered a lumbar MRI (Tr. at 271), which revealed mild lumbar disc dessication at almost every level with mild disc bulging at L4-L5 and L5-S1, but no evidence of disc herniation or centeral stenosis (Tr. at 464; 732).

[4]Celiac disease-sprue is an auto-immune disease in which the lining of the small intestine is damaged from eating gluten.  Symptoms include abdominal pain, bone and joint

6

56), which revealed Barrett's esophagus (Tr. at 388; 457) and mild, chronic esophagitis (Tr. at 362-63; 459-60). When plaintiff returned to Dr. Godar in 2004, he reported continuing to do well on dapsone and feeling much better with no abdominal complaints on a gluten-free diet. (Tr. at 327.) He reported flare-ups only when he ran out of dapsone or was exposed to gluten. (Tr. at 323-34.) However, he continued to complain of finger and toe numbness, which had been a problem for several years. (Tr. at 325-36). Doctors also diagnosed plaintiff with diabetes in the spring of 2004, starting him on medication. (Tr. at 512-15.)

Plaintiff also continued to experience back pain in 2004, visiting the ER for that condition in February and July (Tr. at 402-03; 404-05) and undergoing additional physical therapy in August and September (Tr. at 412-30). The therapists noted plaintiff to walk with an antalgic gait and to use a cane for support. (Tr. at 417.) He experienced limited improvement with therapy. (Tr. at 429-30.)

Plaintiff was able to maintain stable blood sugar readings throughout much of 2004 (Tr. at 507), but in December 2005 he was referred to Dr. Laura Simon for better diabetes control. Dr. Simon suggested insulin or extended release medication, but plaintiff elected to try to get the problem under control with diet and exercise. (Tr. at 643; 647.) Dr. Simon also suggested that plaintiff seek mental health counseling (Tr. at 645-46), and in January and February 2006 he saw Dr. Jason Gucfa, who diagnosed mood disorder with depressive symptoms and generalized anxiety disorder, with a GAF of 55.[5] On mental status exam, Dr. Gucfa found

---

pain, and skin disorders (dermatitis herpetiformis). See http://healthtools.aarp.org (last visited March 15, 2010).

[5]"GAF" stands for "Global Assessment of Functioning." Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 71-80 reflect

7

plaintiff to have depressed mood, restricted affect and poor concentration (Tr. at 394), and he started plaintiff of the anti-depressant Effexor (Tr. at 395). Plaintiff initially reported some improvement, although he still felt sad and irritable. (Tr. at 391-92.) Dr. Simon's progress notes from early 2006 similarly indicate that plaintiff achieved some success regarding his diabetes, losing weight and exercising daily, and reported feeling better on Effexor.[6] (Tr. at 640; 643.) However, in the summer and fall of 2006, he reported renewed cardiac problems,[7] which increased his depressive symptoms, as well as severe peripheral neuropathy. (Tr. at 631; 636-37.)

On July 26, 2006, Dr. Gucfa completed a report on plaintiff's mental ability to work, noting that while plaintiff had some response to medication, his prognosis remained poor unless his medical condition improved. (Tr. at 485.) Dr. Gucfa opined that plaintiff was seriously limited but not precluded in the areas of remembering work procedures, remembering short and simple instructions, carrying out short and simple instructions, maintaining attention for two hour segments, completing a normal work-day without interruption from psychological symptoms, performing at a consistent pace, and dealing with normal work stress; and limited but satisfactory in his ability to maintain attendance and punctuality, sustain a routine without special supervision, work in coordination with others, make simple work-related decisions, ask

---

"transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, and 41-50 "severe" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

  [6]Dr. Godar's notes from 2006 similarly show that plaintiff's dermatitis remained under control. (Tr. at 650; 652.)

  [7]Specifically, plaintiff underwent repeat cardiac catheterization in May 2006 following an abnormal stress test. (Tr. at 408-09; 438-41; 447-52.)

8

simple questions or request assistance, accept supervision and get along with others, respond appropriately to change, and take precautions regarding hazards. (Tr. at 487-88.) Dr. Gucfa opined that plaintiff was unable to meet competitive standards for skilled work. He further opined that plaintiff's ability to interact with the public, maintain socially appropriate behavior, adhere to basic standards of neatness, and use public transportation was limited but satisfactory. (Tr. at 488.) Finally, he stated that plaintiff would be absent more than four days per month based on his impairments. (Tr. at 489.)

On October 23, 2006, Dr. Simon completed a report on plaintiff's physical capacity for work, listing his symptoms as fatigue, difficulty walking, general malaise, abdominal pain, extremity pain and numbness, loss of manual dexterity, diarrhea, and difficulty concentrating. (Tr. at 674.) She stated that plaintiff could never twist, stoop, crouch, climb ladders or stairs, and had significant limitation in his ability to reach, handle or finger. He also had to avoid all exposure to environmental hazards such as extreme heat, cold and humidity. (Tr. at 675.) Regarding plaintiff's ability to lift, she wrote: "He can't. Period." (Tr. at 676.) She wrote that he could sit thirty minutes and stand fifteen minutes at one time, and sit and stand/walk less than two hours in an eight hour workday. (Tr. at 677.) She also stated that his symptoms would frequently interfere with the attention and concentration needed to perform simple work tasks, that he was incapable of even low stress jobs (Tr. at 678), and that he would be absent more than four days per month due to his impairments (Tr. at 679). When asked to identify the earliest date to which the description of symptoms and limitations applied, she wrote that plaintiff's "neuropathy has been present at least since 2001." (Tr. at 679.)

In subsequent treatment notes, Dr. Simon continued to note severe hand pain and numbness, as well as nervousness and anxiousness unresponsive to psychiatric medications.

9

(Tr. at 717; 724-25.)  On April 17, 2008, Dr. Simon prepared a letter stating that, based on her review of the medical record, many of plaintiff's disabilities, including severe back pain, coronary artery disease and peripheral neuropathy, began long before she first saw him.  (Tr. at 715.)[8]

## B.    Hearing Testimony

At the outset of the December 2008 hearing, the ALJ noted the denial of plaintiff's previous applications, the last on June 15, 2003.[9]  (Tr. at 771.)   Plaintiff's counsel acknowledged the previous denials, then amended the onset date to September 8, 2002, the date of plaintiff's fiftieth birthday (Tr. at 771), and the ALJ appeared to accept the amendment (Tr. at 772).

Plaintiff testified that he was 5'10" tall and weighed 287 pounds.  (Tr. at 772.)  He described previous work experience as a housekeeping and maintenance supervisor, assembly line worker, and supply clerk.  He indicated that he last worked in February in 2000 at a factory through a temporary service.  (Tr. at 773-76.)  He stated that he could no longer work due to chronic neck and back pain, neuropathy, arthritis and a heart condition.  He stated that he

---

[8]The SSA obtained reports from several consultants regarding plaintiff's ability to work. On September 8, 2006, Dr. Muceno completed a report finding plaintiff capable of light work as of the date last insured, March 31, 2005.  (Tr. at 608-15.)  On the same date, William Merrick, Ph.D, completed a psychiatric report evaluating plaintiff from February 10, 2000 to March 31, 2005, finding no medically determinable mental impairment.  (Tr. at 616-29.)  On November 20, 2006, Dr. Lu filled out a physical capacity report, finding plaintiff capable of medium work as of the date last insured.  (Tr. at 680-87.)  Also on November 20, 2006, Frances Culbertson, Ph.D, reviewed and affirmed Dr. Merrick's September 8, 2006 report.  (Tr. at 688.)  The ALJ did not rely on these reports, and I do not discuss them further.

[9]It appears that the ALJ was mistaken about the date, as the supplemental transcript filed with the court indicates a final denial date of December 30, 2003 on that application.  (Tr. at 797.)

experienced chest pain and difficulty breathing with even minimal activity, that he could sit for only ten to fifteen minutes and stand for only about ten minutes before experiencing discomfort, that he could walk just five or ten feet without pain, and could lift nothing heavier than a can. (Tr. at 777-77; 781.) He stated that he did virtually nothing around the house. (Tr. at 777-78.) To relieve pain, he took medication and laid down for much of the day. (Tr. at 779.) Asked about Dr. Fechter's note where he said he did not want to work, plaintiff explained that he was in excruciating pain that day, and that he actually said he did not "want to work in this kind of pain." (Tr. at 780.)

The ALJ summoned a VE, who classified plaintiff's past work as light to medium, unskilled to semi-skilled. (Tr. at 784.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education and work experience, limited to light work, precluded from climbing, crawling and kneeling; no more than occasional stooping, bending or crouching; standing no more than thirty minutes at a time; limited but satisfactory in his ability to relate to co-workers, deal with the public, deal with work stress, maintain attention and concentration, behave in an emotionally stable manner, demonstrate reliability, and complete a normal day without interruption from psychological symptoms; and seriously limited but not precluded with regard to complex instructions. (Tr. at 785.) The VE testified that such a person could not perform plaintiff's past work, but could work as a timekeeper, mail sorter, receptionist, general office worker, manufacturing inspector, manufacturing sorter and hand packager. (Tr. at 785-86.)

C.    **ALJ's Decision**

Applying the five-step sequential evaluation process applicable to disability claims, see

11

20 CFR § 404.1520,[10] the ALJ determined that plaintiff had not engaged in substantial gainful activity during the relevant time period, and that he suffered from the severe impairments of back pain, coronary artery disease and depression, but that his dermatitis was not severe. (Tr. at 16-17.) The ALJ did not specifically address the severity of plaintiff's other alleged impairments.

The ALJ then determined that plaintiff's depression did not meet or equal a listed impairment (Tr. at 17), and that plaintiff retained the RFC for light work, except that he was precluded from more than occasional stooping, bending or crouching, and from any climbing, crawling or kneeling. Plaintiff also required a sit/stand option such that he did not have to stand for more than thirty continuous minutes. Regarding plaintiff's mental capacity, the ALJ found that he was limited but satisfactory in his ability to relate to co-workers, deal with the public, deal with work stress, maintain attention and concentration, behave in an emotionally stable manner, demonstrate reliability, and complete a normal workday without interruption from psychological symptoms. He was seriously limited but not precluded from understanding, remembering and carrying out detailed and complex instructions. (Tr. at 18.) The ALJ considered plaintiff's testimony about his symptoms but found it not credible to the extent that plaintiff alleged greater limitations than set forth in the RFC. (Tr. at 18-20.) He also rejected Dr. Simon's report imposing greater limitations because she did not treat plaintiff during the relevant time and her 2008 letter was based on a "very select recitation" of plaintiff's medical

_____

[10]Under this test, the ALJ determines (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether he has a severe mental or physical impairment; (3) if so, whether such impairment meets or equals a presumptively disabling impairment listed in SSA regulations; (4) if not, whether, given his residual functional capacity ("RFC"), the claimant can still perform his past relevant work; and (5) if not, whether he can make the adjustment to other work.

history and plaintiff's subjective complaints.  (Tr. at 21.)  The ALJ did not mention Dr. Gucfa's report.

Relying on the testimony of the VE, the ALJ determined that plaintiff could not return to past work but that other jobs existed in significant numbers which he could have performed during the relevant time period.  (Tr. at 21-22.)  He therefore denied the application.  (Tr. at 22-23.)

## III.  DISCUSSION

Based on a combination of errors, the ALJ's decision must be reversed and the matter remanded for further proceedings.  The ALJ failed to properly address several of plaintiff's impairments, ignored one treating source report and rejected another for insubstantial reasons, and rested his credibility determination on significant factual errors and an incomplete review of the record.

### A.    The ALJ Failed to Consider all of Plaintiff's Impairments

Plaintiff alleged disability based on a number of impairments, but the ALJ found just three of those conditions "severe" – back impairment, heart disease and depression.  He found plaintiff's dermatitis non-severe and did not specifically address the severity of plaintiff's other alleged impairments: celiac sprue, obesity, diabetes and carpal tunnel syndrome.

An error in finding an impairment non-severe at step two does not necessarily require reversal; so long as the ALJ found at least one severe impairment and continued with the sequential evaluation process, the step two error will be harmful only if the ALJ failed to consider all of the claimant's impairments and include appropriate limitations in the RFC.  See Masch v. Barnhart, 406 F. Supp. 2d 1038, 1054 (E.D. Wis. 2005) (explaining that if the ALJ

13

considers all of the plaintiff's impairments, severe and non-severe, at step four, any step two error is likely harmless); see also Terry, 580 F.3d at 477 ("[A]n ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation.").

The ALJ's treatment of plaintiff's dermatitis and obesity does not require reversal. The ALJ noted that plaintiff received treatment for a skin condition during the relevant time, but he saw no evidence that the condition significantly interfered with plaintiff's ability to work. (Tr. at 17.) Plaintiff notes that prior to the date last insured he experienced a severe rash on much of his body, including his face and hands, which was itchy, tender, blistering and draining. He contends that the ALJ's failure to consider the rash in his vocational assessment was particularly harmful, given that many of the jobs relied on by the ALJ require use of the hands. However, plaintiff fails to cite any evidence that his skin condition limited his ability to use his hands or engage in any other work-related activity. The notes from Dr. Godar indicate that plaintiff's condition responded immediately to dapsone, and that his hands were "clear." (Tr. at 330.) Subsequent notes indicate that he continued to do well on dapsone, experiencing problems only when he ran out of the medication or (regarding his related celiac disease) went off his gluten-free diet. (Tr. at 323-29.) The ALJ failed to give specific consideration to plaintiff's obesity, even though at 5'10" and 287 pounds, plaintiff clearly qualified as obese. See http://www.nhlbisupport.com/bmi/bmicalc.htm (producing a BMI of 41.2). However, plaintiff again fails to explain what sort of additional limitations the ALJ should have adopted based on obesity.

The ALJ's treatment of plaintiff's diabetes and carpal tunnel syndrome is a different matter. The ALJ mentioned plaintiff's diabetes, noting that there was no evidence of end organ

14

damage or significant retinopathy, and that his blood sugar levels were under good control. (Tr. at 20.) However, he failed to mention the evidence of severe peripheral neuropathy, which rendered plaintiff's hands and feet numb. (See, e.g., Tr. at 631-33.) Dr. Simon stated that this neuropathy was present since at least 2001 (Tr. at 679), and the treatment records support her contention (Tr. at 238). The ALJ also mentioned plaintiff's "history of carpal tunnel syndrome" (Tr. at 16), yet he failed to find the impairment severe, despite citing the February 14, 2002 EMG testing (Tr. at 16), which revealed "severe carpal tunnel syndrome in both the right and left upper limb" (Tr. at 256). Contradictorily, the ALJ later stated that Drs. Garcia and Raval had not treated plaintiff for this condition since 2001 (Tr. at 20), yet Dr. Garcia performed the February 2002 EMG testing; subsequent records mention the condition as well, into 2006 and 2007. (See, e.g., Tr. at 645; 724.) The ALJ mentioned that plaintiff declined surgery for his carpal tunnel in March 2002 (Tr. at 16), but he failed to explain why this meant the condition was not severe and produced no limitations. The Commissioner fails to defend the ALJ's treatment of these impairments in his brief, and I cannot, given the evidence of severe problems with plaintiff's hands and feet, find the ALJ's erroneous consideration of these issues harmless.

The ALJ also appeared to understate the severity of plaintiff's cardiac condition. The ALJ stated that plaintiff was "treated for unstable angina" in September 2002 (Tr. at 16), but the record shows that he was transported to the hospital at that time and a cardiac catheterization was performed (Tr. at 465; 478-81). Testing revealed "pretty much obliteration of one of his coronary arteries." (Tr. at 289.) The ALJ stated that there was no evidence that plaintiff's cardiac condition significantly worsened since February 2000 (Tr. at 20), but this ignores the both the September 2002 incident and subsequent testing, and the abnormal stress

15

test and further cardiac catheterization plaintiff underwent in 2006 (Tr. at 438-41; 447-52). The ALJ likewise skipped over significant evidence related to plaintiff's back and neck condition, as plaintiff mentions in his brief.

To be sure, it is the ALJ's job, not the court's, to weigh the evidence, but the court cannot affirm a decision that passes over in silence significant evidence contrary to the ALJ's conclusions. See, e.g., Murphy v. Astrue, 496 F.3d 630, 635 (7th Cir. 2007). The matter must be remanded so the ALJ may properly consider the combined effects of all of plaintiff's impairments, even those that would not be considered severe in isolation. Terry, 580 F.3d at 477.

**B.    The ALJ Improperly Ignored or Rejected the Treating Source Reports**

Plaintiff offered treating source reports from Drs. Gucfa and Simon in support of his claim. In his July 2006 report, Dr. Gucfa set forth serious limitations in plaintiff's ability to remember and carry out even simple instructions, maintain attention, and deal with normal work stress. (Tr. at 487-88.) He also stated that plaintiff would be absent more than four days per month based on his impairments (Tr. at 489), which would likely preclude all work. See, e.g., Foster v. Astrue, 548 F. Supp. 2d 667, 669 (E.D. Wis. 2008) (discussing VE testimony that such a rate of absenteeism would preclude all work). Yet the ALJ failed to even mention this report in his decision. The Commissioner notes that Dr. Gucfa produced the report sixteen months after the date last insured and argues that the ALJ properly relied on evidence from the relevant time period. However, since the ALJ said nothing about the report, I cannot assume that he rejected it as untimely. See Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

16

In any event, even if the ALJ <u>had</u> rejected the report for this reason, his decision would be erroneous.  This is so because a physician may provide a "retrospective diagnosis," so long as the record contains corroborating evidence contemporaneous to the eligible period.  <u>See, e.g.</u>, <u>Allord v. Barnhart</u>, 455 F.3d 818, 822 (7th Cir. 2006); <u>Estok v. Apfel</u>, 152 F.3d 636, 640 (7th Cir. 1998).  The corroboration need not come in the form of a medical diagnosis; lay evidence may also suffice, particularly in the case of depression, a notoriously under-reported disease.  <u>Wilder v. Apfel</u>, 153 F.3d 799, 802 (7th Cir. 1998).  The record here contains evidence of mental illness prior to the date last insured, including the prescription of Paxil. (<u>See, e.g.</u>, Tr. at 240.)  And if the ALJ was uncertain whether Dr. Gucfa's report applied to the relevant time period, he could have re-contacted the doctor for clarification.  <u>See</u>  20 C.F.R. § 404.1512(e)(1) (indicating that the SSA will re-contact a treating source when his opinion is unclear).

Dr. Simon likewise prepared a report, dated October 23, 2006, containing limitations that would appear to preclude all work.  (Tr. at 674-79.)  She later produced a letter, dated April 17, 2008, explaining that many of plaintiff's disabilities began long before she began seeing him in 2005.  (Tr. at 715.)  The ALJ rejected the report, noting that Dr. Simon did not treat plaintiff prior to the date last insured, and stating that the April 2008 letter contained "a very select recitation of his pertinent medical history" and was based primarily on plaintiff's subjective complaints.  The ALJ also stated that the report was inconsistent with the record as a whole and some of plaintiff's own statements, i.e. plaintiff once said that he could lift up to twenty-five pounds, while Dr. Simon opined that he could not do any lifting.  (Tr. at 21.)

Dr. Simon's 2008 letter refers to contemporaneous medical evidence of plaintiff's back pain, coronary artery disease and peripheral neuropathy, and the ALJ did not explain how this

17

constituted a "select recitation" of the record.  Nor did he explain how Dr. Simon's opinions were inconsistent with the record as a whole.  The record in this case consists of 788 pages, and the only specific inconsistency the ALJ mentioned was plaintiff's statement in a disability report that he could lift up to twenty-five pounds (Tr. at 73), while Dr. Simon said he could do no lifting; the ALJ cited no contrary medical evidence in rejecting Dr. Simon's report.[11]  In any event, this provides no basis for rejecting all of Dr. Simon's other opinions as to plaintiff's capacity for work.  See SSR 96-5p ("Adjudicators must remember . . . that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, . . . and that it may be necessary to decide whether to adopt or not adopt each one.").  The ALJ must "always give good reasons" for the weight afforded a treating source's opinion, 20 C.F.R. § 404.1527(d)(2), and the ALJ failed to do so with Dr. Simon's report.

The Commissioner argues that the ALJ properly relied on Drs. Sobolewski and Fechter, who treated plaintiff prior to the date last insured, in rejecting the opinions of Drs. Gucfa and Simon.  But the ALJ did not cite records from Sobolewski and Fechter in rejecting the treating source reports; rather, he discussed those records in evaluating plaintiff's credibility.  (Tr. at 20.)  Thus, the Commissioner's argument misses the mark.  See Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002) ("[T]he ALJ (not the Commissioner's lawyers) must 'build an accurate and logical bridge from the evidence to her conclusion.'") (quoting Dixon v. Massanari, 270 F.3d

---

[11]It is also puzzling that the ALJ would first state that Dr. Simon's report was based on plaintiff's subjective complaints rather than evidence, but later conclude that the report was inconsistent with the record because Dr. Simon's lifting limitation differed from plaintiff's subjective estimate of how much he could lift.  The fact that Dr. Simon's opinion as to plaintiff's lifting ability differed from what plaintiff said he could lift suggests that she was not merely parroting plaintiff's assertions.

1171, 1176 (7th Cir. 2001)).  In any event, the only "opinion" from Dr. Sobolewski the ALJ mentioned was a July 1, 2003 note, where plaintiff was found to be "stable" on his current medication regimen.  (Tr. at 20.)  In that very same note, Dr. Sobolewski stated that plaintiff was:

> here to discuss his disabilities which are multiple.  He has significant coronary artery disease with 2 MIs in the recent past, has had 1 in the most recent past.  He has chronic back pain and many disabling conditions.  He has filled out his form for disability and I told him that when he contacts them to make sure he makes it available to them that I am his treating physician and that any forms that need to be filled out, I would be glad to take care of those for him.

(Tr. at 277.)  Based on this note, it appears that Dr. Sobolewski was supportive of plaintiff's application for disability, yet the ALJ extracted one word – "stable" – to support his conclusion that plaintiff was not disabled.  See Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994) (stating that an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion").

It is true, as the ALJ noted, that Dr. Fechter, after quoting plaintiff as saying "I just don't want to work anymore," refused to support plaintiff's application for disability.  (Tr. at 20.)  It is also true that the ALJ, not the reviewing federal court, gets to resolve conflicts in the evidence.  But the decision must demonstrate that the ALJ actually resolved the important conflicts.  Merely choosing an opinion that supports the ALJ's ultimate conclusion, without mentioning the evidence on the other side, will not suffice.  See Terry, 580 F.3d at 476; Getch v. Astrue, 539 F.3d 473, 482-83 (7th Cir. 2008).  This leads to the unresolved conflict over the above-quoted statement and thus to the ALJ's evaluation of plaintiff's credibility.

## C.     The ALJ Erred in Evaluating Plaintiff's Credibility

Plaintiff testified that due to his impairments he experienced severe pain and difficulty

19

breathing, which significantly limited his ability to function. He stated that he did little around the house and spent most of the day lying down. (Tr. at 776-78.) He also stated that he actually told Dr. Fechter, not that he did not want to work, but that he did not want to work in this kind of pain. (Tr. at 780.)

Following the two-step test outlined in SSR 96-7p,[12] the ALJ concluded that plaintiff's impairments could produce the symptoms he alleged, but that his statements about the severity of those symptoms were not credible to the extent they were inconsistent with the RFC the ALJ adopted. (Tr. at 20.) The court generally reviews an ALJ's credibility determination deferentially, reversing only if it is patently wrong. However, where the credibility determination is based upon objective factors rather than subjective considerations, the court has greater freedom to review the ALJ's decision. Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008). The reviewing court may also reverse if the ALJ failed to provide specific reasons for the credibility determination, grounded in the evidence, as SSR 96-7p requires. E.g., Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003); see also Myles v. Astrue, 582 F.3d 672, 676 (7th Cir. 2009) ("We will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding,

_____

[12]SSR 96-7p explains that in evaluating credibility the ALJ must first determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms. If not, the symptoms cannot be found to affect his ability to work. Second, if the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which they limit his ability to work. SSR 96-7p. In making this determination, the ALJ may not discredit a claimant's testimony based solely on a lack of support in the medical evidence. Rather, the ALJ must consider all of the evidence, including the claimant's daily activities; the location, duration, frequency and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication the claimant takes; treatment, other than medication, for relief of pain or other symptoms; any measures the claimant uses to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

20

supported by substantial evidence.  Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009).  But the ALJ may not simply ignore evidence.").

The ALJ's credibility analysis contained significant errors and omissions in this case. First, the ALJ stated that there was no evidence that plaintiff used a cane prior to the date last insured (Tr. at 19), yet physical therapy notes from August and September 2004 indicate that plaintiff presented with an antalgic and used a cane for support (Tr. at 417-18).[13]  Second, the ALJ relied on plaintiff's August 7, 2006, functioning report for the proposition that plaintiff could do more than he said at the hearing, yet the ALJ failed to explain how the modest daily activities set forth in the report contradicted plaintiff's claim of disability.[14]  See, e.g., Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006) ("We have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home.").  Finally, as noted above, the ALJ relied on plaintiff's statement to Dr. Fechter that "I just don't want to work anymore" (Tr. at 20), but he failed to consider plaintiff's attempt to correct the record with Dr. Fechter during their next

_____

[13]The Commissioner concedes the error, but notes that according to other contemporaneous medical records plaintiff was doing well at the time he started using the cane. The ALJ did not cite this evidence, and judicial review is limited to the reasons the ALJ supplied. Steele, 290 F.3d at 942.

[14]The Commissioner argues that the ALJ did not compare plaintiff's testimony to the 2006 functioning report to suggest that anyone was being less than truthful; the ALJ merely observed that plaintiff's condition seemed to worsen after his date last insured, and the 2006 report was more relevant than his 2008 testimony. It is, frankly, unclear what the ALJ meant. He wrote that plaintiff's "testimony concerning his functioning is belied by statements he made on August 7, 2006 in a functioning report." (Tr. at 19.) This suggests a negative credibility assessment. However, in the paragraph immediately preceding this statement, the ALJ noted that plaintiff's 2008 hearing testimony related to his condition then, more than three years after the date last insured. SSR 96-7 requires the ALJ to provide reasons sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. The ALJ failed to do so here.

21

office visit (Tr. at 266) or the explanation plaintiff provided the ALJ at the hearing (Tr. at 780). Of course, the ALJ was not required to accept plaintiff's account, but without some discussion in the decision I cannot tell if he rejected the explanation, ignored it or did not hear it.

It is true that the ALJ also relied on other factors in evaluating credibility, including the fact that plaintiff had filed numerous unsuccessful applications for disability; that some of his impairments arose after the date last insured; and that his hearing testimony pertained to his condition three years after the date last insured. (Tr. at 19.) The Commissioner argues that, given this broader discussion, the errors and omissions discussed above demonstrate only that the ALJ did not write a perfect decision. Courts do not require perfection, but where the cumulative effect of an ALJ's errors and omissions leaves the court unable to trace a reliable path from the evidence to the result, remand is required. See Barrett v. Barnhart, 355 F.3d 1065, 1069 (7th Cir. 2004); Zurawski v. Halter, 245 F.3d 881, 887-88 (7th Cir. 2001).[15]

---

[15]Plaintiff's other arguments do not require extended discussion. Plaintiff faults the ALJ for failing to consider impairments other than depression at step three, but he fails to demonstrate, or even specifically argue, that any of his other impairments, alone or in combination, meet or equal a Listing. See Masch, 406 F. Supp. 2d at 1051 ("Absent identification of the specific Listing and some demonstration that the criteria are met, plaintiff's vague contention that her impairments in combination equal a Listing fails."). Plaintiff also argues that the ALJ erred in failing to more specifically define the parameters of the sit/stand option. However, the VE appeared to have no trouble understanding the ALJ's hypothetical question based on this RFC, identifying light jobs "with a sit/stand option as the person wanted to do it." (Tr. at 786.) Defendant cites Peterson v. Chater, 96 F.3d 1015, 1016-17 (7th Cir. 1996), but in that case the ALJ relied on the Grid; the court remanded so the ALJ could summon a VE to opine on jobs the claimant could perform with a sit/stand option. Here, the ALJ relied on a VE at step five. Nor did the ALJ did rely on VE testimony in conflict with the Dictionary of Occupational Titles ("DOT"), as plaintiff also alleges. While SSR 00-4p requires the ALJ to identify and explain any conflict between the DOT and the VE's testimony, this duty arises only when the conflict between the DOT and VE testimony is apparent. See Overman v. Astrue, 546 F.3d 456, 463-64 (7th Cir. 2008). "Because the DOT does not address the subject of sit/stand options, it is not apparent that the testimony conflicts with the DOT." Zblewski v. Astrue, 302 Fed. Appx. 488, 494 (7th Cir. 2008). Finally, plaintiff argues that the ALJ violated his due process rights in applying res judicata based on his prior applications

22

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is remanded for further proceedings consistent with this decision, pursuant to § 405(g), sentence four. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 2nd day of April, 2010.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

without providing prior notice of the issue or obtaining complete records related to those applications. Because the matter is being remanded for other reasons, and plaintiff is now on notice that res judicata may be an issue, I need not address his constitutional argument. See Chowdhury v. Ashcroft, 241 F.3d 848, 853 (7th Cir. 2001) (explaining that courts should avoid deciding constitutional issues if possible).